**REDACTED PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VAREX IMAGING CORPORATION | Case No. 18-cv-6911 |
| Plaintiff, | |
| v. | Judge John Robert Blakey |
| RICHARDSON ELECTRONICS, LTD., ROBERT KLUGE, DAVID LEE, and JOHN POSTMAN | Magistrate Judge Heather K. McShain |
| Defendants. | **JURY TRIAL DEMANDED** |

**THIRD AMENDED COMPLAINT FOR PATENT INFRINGEMENT
AND MISAPPROPRIATION OF TRADE SECRETS**

Plaintiff Varex Imaging Corporation ("Varex") files this Complaint against

Richardson Electronics, Ltd. ("RELL"), alleging as follows:

**THE PARTIES**

1.      Varex is a Delaware corporation with its principal place of business at 1678

South Pioneer Road, Salt Lake City, Utah 84104.

2.      RELL is a Delaware corporation with its principal place of business at

40W267 Keslinger Road, La Fox, Illinois 60147.

3.      Robert Kluge ("Kluge") is an individual residing at 12 Wanderwood Way,

Sandy, Utah 84092.

4.      David Lee ("Lee") is an individual residing at 2756 East Palma Way, Salt

Lake City, Utah 84121.

5.     John Postman ("Postman") is an individual residing at 744 Coal Creek Circle, Sandy, Utah 84094.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331, 1338, 1367, and 1836(c) because this Court has original jurisdiction over Varex's causes of action under the Patent Act, 35 U.S.C. § 101 *et seq*. and the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et sq*., and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Varex's other causes of action arising under state law.

7.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b). A substantial part of the events giving rise to Varex's claims occurred in this District, including RELL's acts of infringement and the acts of RELL, Kluge, Lee, and Postman ("Defendants") constituting misappropriation. RELL's corporate headquarters in La Fox, Illinois, and this headquarters is a physical office that serves as the regular and established place of business of RELL.

8.     This Court has personal jurisdiction over Defendants. RELL resides in, is at home in, and regularly and continuously conducts business in this District. Kluge is a member of RELL's board of directors (a position that he voluntarily accepted), and personal jurisdiction accordingly exists over him in Illinois through "[t]he performance of [his] duties as a director or officer of a corporation [RELL] . . . having its principal place of business within [Illinois]." 735 ILCS 5/2-209(a)(12); *see also Hach Co. v. Hakuto Co., Ltd.*, 784 F. Supp. 2d 977, 985–87 (N.D. Ill. 2011).  Furthermore, Kluge, Lee, and Postman routinely travelled to RELL's corporate headquarters in La Fox, Illinois to conduct business on behalf of RELL, are contractually engaged with and financially compensated by RELL, and

2

unlawfully disclosed Varex trade secrets to RELL both physically in the District and via communications delivered to RELL in the District. RELL has infringed or induced infringement (and continues to do so) and has committed acts constituting misappropriation of trade secrets in this District at its La Fox, Illinois headquarters.

## PATENTS-IN-SUIT

9. On September 24, 2002, U.S. Patent No. 6,456,692 ("the '692 patent"), titled HIGH EMISSIVE COATINGS ON X-RAY TUBE COMPONENTS, was duly issued to Ricky B. Smith.

10. Varex is the owner of all rights, title, and interest in the '692 patent.

11. A true and correct copy of the '692 patent is attached hereto as **Exhibit A** and is incorporated herein by reference.

12. The '692 patent is generally directed towards an X-ray tube with a vacuum enclosure in which a cathode generates electrons that are converted into X-rays upon collision with a rotating anode, which is supported by a rotor incorporating a highly emissive coating, and in which the bearing assembly that supports the rotor is located at least partially within the rotating anode.

13. On February 11, 2003, U.S. Patent No. 6,519,317 ("the '317 patent"), titled DUAL FLUID COOLING SYSTEM FOR HIGH POWER X-RAY TUBES, was duly issued to John E. Richardson, Gregory C. Andrews, Robert S. Miller, and Allen C. Campbell.

14. Varex is the owner of all rights, title, and interest in the '317 patent.

15. A true and correct copy of the '317 patent is attached hereto as **Exhibit B** and is incorporated herein by reference.

16.     The '317 patent is generally directed towards a system and method for cooling a high-power X-ray tube in which an X-ray tube is disposed within a housing, a first coolant in the housing absorbs heat from the X-ray tube, and a second coolant flows through a passageway within the tube that directs the flow of the second coolant proximate to a portion of the X-ray tube.

17.     The '692 patent and '317 patent are collectively referred to as the "Asserted Patents."

## VAREX AND THE SNOWBIRD X-RAY TUBE

18.     Varex's experience in the medical device industry dates to the 1930s, when Eimac Products was founded to produce high-quality, high-power X-ray transmitter tubes. At the end of World War II, Eimac Products began to grow its business to include new tube types, such as cathode ray tubes and microwave tubes for radar applications. Eimac Products merged with Varian Associates in 1965, which later became Varian Medical Systems, Inc. ("Varian") in 1999. Varian thereafter emerged as an industry leader and innovator in the design and manufacture of key components of X-ray imaging systems, including X-ray tubes, digital flat-panel detectors, and other image processing solutions.

19.     On January 28, 2017, Varex spun off from Varian to provide a business focused on the design and manufacture of X-ray imaging components (the "Spin-Off").

20.     Global manufacturers of X-ray imaging systems rely on Varex's experience designing and manufacturing X-ray sources, digital detectors, connecting devices, and imaging software as components in their X-ray systems.

21.     Varian, and now Varex, has been awarded and continues to prosecute numerous patents covering innovations in the United States and around the world resulting

4

directly from Varian's decades-long research and development efforts. It has sponsored the work of dozens of inventors and invested tens of millions of dollars in R&D efforts. Varex employs approximately 2,000 people and produces approximately 25,000 X-ray tubes and 23,000 X-ray panels each year. Varex operates in the state of Illinois employing individuals supporting sales, engineering, manufacturing, purchasing, planning, warehousing, finance, and quality functions.

22.     One of Varex's most successful products is the MCS-7078 X-ray tube, which was the result of many years of research, development, and testing efforts by Varex prior to the Spin-Off from Varian. Those efforts yielded numerous innovations and developments that resulted in reliable and accurate X-ray sourcing for use in the Toshiba / Canon Aquilion Computed Tomography ("CT") System. This X-ray tube was nicknamed "the Snowbird," a reference to the ski resort near Varian's (now Varex's) X-ray tube research, development, and manufacturing facilities in Utah.

23.     The current version of the Snowbird tube is the MCS-7078D rev 2.  The MCS-7078D rev 2 Snowbird X-ray Tube (hereafter, "Snowbird tube") incorporates the emissive coating innovations of the '692 patent and the dual coolant innovations of the '317 patent.

## RELL'S INTRODUCTION OF THE ALTA750 X-Ray Tube

24.     Prior to 2014, RELL had never made or sold CT X-ray tubes.  RELL's ALTA750 X-ray tube is the first CT scanner X-ray tube made by RELL.

25.     ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████.

26.     Instead, RELL hired Dunlee employees and formed Richardson Healthcare, a strategy business unit focused on replacement parts for the diagnostic imaging market.

27.     In August 2014, RELL announced the hiring of Dunlee's former president Pat Fitzgerald as the Executive Vice President and General Manager of Richardson Healthcare. As of August 13, 2014, Mr. Fitzgerald's role was to "have oversight of the strategy direction of Richardson Healthcare which will include new and refurbished CT tubes. . . ."

28.     RELL hired Dunlee engineer Thomas Muchowicz who served as one of the project managers for RELL's "CT Tube Project."



████████████████████████████████████████████████

██████████████████████████████████████████████

32. ███████████████████████████████████████

███████████████████████████

33. ███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

███████████████ ██ █████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

██████████████████



34. 

35.

36.

37.    RELL chose the name ALTA750 to signal and emphasize that the X-ray tube is an alternatively sourced version of Varex's Snowbird tube. Alta is a sister ski resort to the Snowbird ski resort in Utah. 750 refers to the numerical designation in the name of the Snowbird X-ray tube when it was sold by Toshiba (now Canon), CXB-750.

38.    RELL's first ALTA750 was made in ██ 2018, with increased advertising and solicitation of sales thereafter.

39.    As discussed below, RELL's manufacture and sale of ALTA750 X-ray tubes are the product of RELL's willful infringement of Varex's patents and repeated misappropriation of Varex's trade secrets. RELL willful infringed Varex's patents and misappropriated Varex's trade secrets in order to directly compete with Varex in the manufacture of X-ray tubes for use in Aquilion Series CT scanners.

**VAREX'S SNOWBIRD X-RAY TUBE**

40.    As part of the Spin-Off, Varex acquired all of Varian's rights, title, and interest in various proprietary and confidential trade secrets relating to the design and manufacture of X-ray imaging components, including the Snowbird X-ray tube.

41.    Varex owns all right, title and interest in and to the legal rights being asserted in this Second Amended Complaint, whether acquired by assignment from Varian or in its own right.

42.    Since its introduction, the Snowbird X-ray tube has been one of Varex's flagship products, and it has an established record of success in the market.

43.    The Snowbird X-ray tube with a portion of the housing removed is shown below.



44.    The Snowbird X-ray tube with the housing in place is shown below.



9

45.    The Snowbird X-ray tube removed from the housing is shown below.



46.    X-ray tubes are known within the industry to be consumables. In the lifespan of the CT scanner, it is expected that the X-ray tube will need to be replaced multiple times.

47.    The inside of the X-ray tube must operate under an exceptional degree of vacuum. There are less air particles found within a given volume within the Snowbird X-ray tube than present in outer space.

48.    The vacuum under which the Snowbird X-ray tube operates is critical because of the manner in which X-rays are generated. The electron source (also referred to as the cathode) in the Snowbird X-ray tube sends out a stream of electrons that are directed to a rotating anode. If optimal vacuum conditions are not maintained, particles will interfere with the electron path and prevent proper operation of the X-ray tube.

49.    This bombardment of electrons against the target anode creates X-rays that scatter in all directions. Some X-rays will travel to and out of the "window" integrated into the X-ray tube vacuum enclosure. This is the one location in which the X-rays are to exit and pass out to be directed to the patient for CT scanning purposes. 99% of the electron energy becomes heat that needs to be removed from the X-ray tube.

50.     Some of the heat absorption in the Snowbird X-ray tube is performed by a shield structure that has an aperture through which the electrons pass from cathode to anode, and employs a curved surface that will absorb the backscattered electrons and take on the heat. In the Snowbird X-ray tube, the shield structure is also designed to partially define a pathway for a coolant.

51.     The interior of the Snowbird X-ray tube is encased by a vacuum enclosure. The Snowbird X-ray tube utilizes a metal enclosure that contains the components of the X-ray tube. The manufacturing process requires that the vacuum enclosure is brazed together, particles evacuated from the interior, and the X-ray tube is heated in excess of 1050 degrees Celsius for approximately 36 hours.

52.     The Snowbird X-ray tube is not designed to be repaired or have a worn component individually replaced. The only way to access an internal component from a Snowbird X-ray tube is to cut it open. This destroys the X-ray tube's ability to function because it can no longer hold a proper vacuum. As soon the enclosure is opened in any small amount, the vacuum is eliminated and particles from the air enter, introducing contaminants and rendering the X-ray tube non-functional. (Dkt. 13, Dr. Bani-Hashemi Decl., ¶ 193.)

53.     The Snowbird shield structure is brazed to portions of the vacuum enclosure to create an integrated assembly. Once the vacuum enclosure is compromised, a new shield structure needs to be manufactured. (*Id.*, ¶ 194.)

54.     Merely repairing the vacuum is not sufficient. The other components would have to be reconditioned and put through the extensive cleaning and vacuum process

necessary for an operable X-ray tube. Regardless of whether a component is new or recycled, it must go through same extensive cleaning processes. (*Id.*, ¶ 195.)

55.    Upon return of a spent Snowbird X-ray tube, Varex will scrap the X-ray tube insert and examine components to see if they can be refurbished and reused. The tube itself is destroyed.

56.    Varex does not refurbish Snowbird X-ray tubes by replacing or repairing any individual parts within the X-ray tube. The metal brazing of components, extensive demands for an exceptional vacuum inside the tube, and need to avoid impurities in the interior of the tube makes interior individual component replacement impractical.

57.    Technology developed in concert with the Snowbird project resulted in the issuance of numerous patents from the United States Patent and Trademark Office ("USPTO"). These features include technology designed to handle the extreme amounts of heat generated by, and compact space requirements needed for, the X-ray tube in a CT scanner.

## VAREX TRADE SECRETS CREATED IN SNOWBIRD X-RAY TUBE DEVELOPMENT

58.    Building the Snowbird X-ray tube is a highly complex process involving confidential manufacturing processes, supplier relationships, cost-reduction strategies, and technical and business know-how. To provide sufficient manufacturing yields for the Snowbird X-ray tube, Varian developed numerous trade secrets through experimentation and iterative changes spanning over years.  These trade secrets include cleaning processes for components within the vacuum (regardless of whether new or recycled), vacuum processes, and seasoning processes. As part of the Spin-Off, Varian transferred the right,

title, and legal interest in these trade secrets to Varex. Such highly confidential information provides a competitive advantage, the disclosure of which is damaging to Varex.

59.     Varex, including work conducted by Varian prior to the Spin-Off, developed and maintained numerous confidential trade secrets for development of X-ray tubes, including the Snowbird X-ray tube (collectively, "Varex Trade Secrets").

60.     Varex Trade Secrets include, but are not limited to, customer specifications, engineering drawings, cleaning processes, component recovery processes, exhaust processes, bearing design and coatings, bake-out processes, brazing processes, welding processes, target firing processes, cathode and filament assembly, supplier lists, and wear analyses.

61.     As part of the Spin-Off, Varex owns all of Varian's rights, title, and interest in various proprietary and confidential trade secrets relating to the design and manufacture of X-ray imaging components and devices (including the Snowbird), including the Varex Trade Secrets.

62.     Varex Trade Secrets are not generally known in the X-ray tube industry or to anyone outside of Varex, except persons or entities bound to stringent confidentiality obligations. In particular, information relating to the cleaning of components (new or reused) to be incorporated into new X-ray tubes, vacuuming, bake-out, brazing, and firing processes, and seasoning protocols for completed X-ray tubes were and are not generally known, access to Varex's facilities, factory floor, and research and development laboratories are restricted (and were similarly restricted before the Spin-Off), and such information was and remains restricted to those essential engineers and personnel that are required to know such information to satisfy their responsibilities relating to the manufacture of X-ray tubes.

13

63.     Trade secrets, including Varex Trade Secrets, developed in concert with the Snowbird project have provided Varex with a competitive advantage in the ability to manufacture X-ray tubes with a sufficient yield to render X-ray tube production profitable. This knowledge was developed over numerous years and is highly valuable to building Snowbird X-ray tubes.

64.     Access to the Varex Trade Secrets and use of Varex's patented technology greatly decreases the time for a competitor to present sufficient manufacturing yields and sell a form-fit-and-function replacement for the Snowbird X-ray tube that could steal away sales from Varex (and its exclusive buyer) to a competitor.

65.     At all relevant times, Varian and Varex undertook reasonable measures to keep the Varex Trade Secrets secret, including those measures identified above in paragraph 62. Their protective measures were specifically targeted at protecting sensitive confidential and proprietary information such as the Varex Trade Secrets, rather than more general corporate information.

66.     At all relevant times, Varian and Varex employees (including executives) were required to sign a proprietary information and inventions agreement that obligated them to safeguard confidential information.

67.     At all relevant times, Varian and Varex provided training sessions for their personnel to advise them on what constituted confidential information (including the Varex Trade Secrets). These training sessions included instructions on identifying confidential information and detailed descriptions of multiple categories of confidential information relating to the manufacture of the Snowbird.

68.     Personnel were advised that they should consider any information that is not discoverable by disassembling a product as confidential, including information relating to manufacturing processes and design parameters for new X-ray tubes.  Personnel were further instructed that they were responsible for protect confidential information from unauthorized disclosures or use, which could seriously harm the company's financial performance and competitive position.

69.     Confidential information relating to manufacturing processes include (among other matters) cleaning processes, surface preparation and coatings, pump processes, aging processes and techniques (*i.e.*, tube seasoning), target firing processes, ceramic brazing processes, ball coating specifications and coating processes, e-beam processing, and filament flashing processing.

70.     Confidential information relating to design parameters for new X-ray tubes include (among other matters) anode glass shape and design, bills of materials, engineering drawings, and design tolerances.

71.     At all relevant times, Varian and Varex maintained password-protected document management systems that stored documents containing confidential information on secure servers.

72.     As part of those document management systems, Varian and Varex maintained document control procedures that ensured that they maintained only the most recent versions of documents, and replaced obsolete versions of those documents as they are revised and updated.

73.     At all relevant times, documents regularly contained captions that warned Varian and Varex's personnel that printing the documents meant that they would no longer

be "controlled documents," meaning that the printed copy would not be within Varian's document control procedures and not subject to automatic update when the original document was revised or updated.

74. Maintaining controlled documents were critical to Varian and Varex's efforts to log the most updated manufacturing processes for X-ray tubes and also minimize the risk of personnel inadvertently disclosing copies of documents reflecting those processes.

75. At all relevant times, Varian and Varex restricted access to their document management systems to company personnel on a need-to-know basis, and they prohibited the unauthorized removal of any confidential information from their facilities.

76. At all relevant times, Varian and Varex also conducted exit interviews for departing personnel, during which the departing personnel were instructed to return confidential information in their possession and were given copies of their signed proprietary information and inventions agreements. Departing personnel were also reminded of their confidentiality obligations during those exit interviews.

77. At all relevant times, public releases of information (such as through interviews, presentations, and material provided to media outlets) were subject to detailed internal review processes before the release, which were designed to protect company trade secrets from disclosure.

78. At all relevant times, a "Bring Your Own Device" Program was also in place that required personnel using their own mobile devices for company purposes to register the devices and comply with heightened security measures that allowed the devices to be remotely located, locked, or wiped clean, and thereby help to prevent data breaches.

## FORMER EMPLOYEES WITH KNOWLEDGE OF VAREX TRADE SECRETS

### ROBERT KLUGE

79.     Robert Kluge ("Kluge") worked at Varian from 1993 through 2014.  He joined Varian in January 1993 as a Vice President and General Manager.  In December 1999, Kluge became Vice President of X-ray Products.  From February 2008 through February 2013, Kluge was Varian's Senior Vice President of X-Ray Products.  Kluge's employment with Varian concluded in February 2014.

80.     During Kluge's tenure, Kluge was aware of and had access to proprietary and confidential documents and information that constitute Varex Trade Secrets relating to the Snowbird X-ray tube.

81.     Kluge was the general manager of the Snowbird development project.  In this role, he had access to every detail of the design and development process, including trade secrets and proprietary information as to research and design efforts for the Snowbird X-ray tube, how parts were manufactured, how parts were obtained and who supplied those parts, and cost-cutting measures put in place in the manufacturing process for the Snowbird X-ray tube.  Kluge was also aware of the amount of requested capital funds to design, build, and install the initial manufacturing equipment for processing the Snowbird X-ray tube development as well as the requested equipment.

82.     Kluge had access to Varex Trade Secrets, including technical discussions regarding the design and development of the Snowbird X-ray tube, and knowledge of the roles and responsibilities of engineers with intimate knowledge of the design and Varex Trade Secrets.

83. The Varex Trade Secrets were disclosed in confidence to Kluge during the course of his employment with Varian and Varex.

84. Kluge was aware that these Varex Trade Secrets were confidential, proprietary information. Kluge was knew or had reason to know of his duty to Varex to maintain the secrecy of this information, even after terminating his employment with Varex.

85. On information and belief, Kluge signed a proprietary information and inventions agreement with Varian setting forth his obligations not to disclose proprietary or confidential information.

86. On information and belief, Kluge received training from Varian regarding what constituted confidential information relating to the manufacturing of the Snowbird (including the Varex Trade Secrets).

87. On information and belief, Kluge had an exit interview when he left Varian, during which he was instructed to return confidential information in his possession, was given a copy of his signed proprietary information and inventions agreement, and was reminded of his confidentiality obligations.

**DAVID LEE**

88. From approximately July 17, 1995 to May 2, 2014, David Lee ("Lee") worked for Varian. Lee served as a Senior Research Scientist at Varian. Lee was part of Varian's engineering team responsible for the design and manufacture of Varian's X-ray imaging components, including the Snowbird.

89.     On or about July 17, 1995, Lee signed a proprietary information and inventions agreement with Varian ("Lee PIIA"), a true and correct copy of which is attached as **Exhibit C**.

90.     Pursuant to that agreement, Lee agreed to the following confidentiality restrictions:

> 2.      I agree that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business affairs. including its inventions, products, processes, protects, developments, arid plans are and shall be the property of the Company, and I will not disclose the same to unauthorized persons or use the same for any unauthorized purposes without written approval by an officer of the Company, either during or after the term of my employment. until such time as such information has become public knowledge. I also agree to treat all U. S. Government classified information and material in the manner specified by applicable Government regulations.
>
> 3.      I agree that all files, letters. memos, reports, sketches. drawings, laboratory notebooks or other written material containing matter of the type set forth in paragraph 2 above which shall come into my custody or possession shall be and are the exclusive property of the Company to be used by me only in the performance of Company duties and that all such records or copies thereof in my custody or possession shall be delivered to the Company upon termination of my employment.
>
> 4.      I agree that my obligation not to disclose or to use proprietary or confidential information of the types set forth in paragraphs 2 and 3 above also extends to such types of information of customers of the Company or suppliers to the Company who may have disclosed or entrusted such information to the Company or me in the course of business.

(Ex. C, Lee PIIA ¶¶ 2–4.)

91.     While at Varian, Lee had access to confidential, proprietary and trade secret information related to Varian's products, including the Snowbird X-ray tube, including Varex Trade Secrets.  Specifically, Lee had access to the design, development and research

related to the Snowbird. Examples of such trade secret information to which Lee had

knowledge and/or access include:

> Highly confidential customer specifications for the Snowbird X-ray tube;
>
> Bearing design and coatings for Snowbird, including schematics, design information, and strategic decision-making regarding the bearing.
>
> Vendors for Snowbird parts, such a casting vendors, for increased reliability and improved performance;
>
> Aperture design and materials;
>
> Target designs;
>
> Design and development of the Snowbird anode including discussions of the target support assembly, integral target stem assembly, welding, anode assembly firing research and development, target track reworking, the rotor design, reuse of targets;
>
> Methods and supplier for cleaning new and recyclable components; and
>
> Brazing processes.

92. Lee's employment with Varian was terminated on or about May 2, 2014. Lee

had an exit interview when he left Varian, during which he was instructed to return

confidential information in his possession, was given a copy of the Lee PIIA, and was

reminded of his confidentiality obligations.

93. Lee signed a separation agreement on May 2, 2014 ("Lee Separation

Agreement"), a true and correct copy of which is attached as **Exhibit D**. In the Lee

Separation Agreement, Lee agreed not to "...disclose to others any confidential or

proprietary information regarding Varian's practices, policies, procedures, business and

manufacturing processes, trade secrets, patents, products, Research and Development

efforts, customer lists, price lists, marketing and sales plans, company financials, employees, vendors and suppliers, or other nonpublic information concerning Varian's business affairs which [he] obtained during the course of his employment with Varian." (Ex. D, Lee Separation Agreement, ¶ 7.)

94.     Lee also signed an employee termination statement on May 1, 2014 ("Lee Termination Statement"), a true and correct copy of which is attached as **Exhibit E**.  In it, he certified that he did not have in his "...possession or control and that [he had] not taken or will not take from the Company premises, or, if taken, have returned any and all Company property and/or proprietary information, which includes but is not limited to products, tools, inventory, or proprietary copies thereof including engineering notebooks, patent applications, or dockets, technical or other type reports, contracts, purchase orders, prints, drawings, specifications or other printed or written material, whether or not prepared by [him], which is not generally available to the public."  (Ex. E, Lee Termination Statement ¶ A.)

95.     He further agreed "not to disclose any information or data, which is proprietary to the Company and is not generally available to the public[.]"  *Id.*

96.     Lee received training from Varian regarding what constituted confidential information relating to manufacturing of the Snowbird (including the Varex Trade Secrets).

### JOHN POSTMAN

97.     From approximately January 19, 1995 to March 30, 2013, John Postman ("Postman") worked for Varian.  Postman served as a Mechanical Engineer and Cost Reduction Manager.

98.     On or about February 15, 1995, Postman signed a proprietary information and inventions agreement with Varian ("Postman 1995 PIIA"), a true and correct copy of which is attached as **Exhibit F**.

99.     Pursuant to the Postman 1995 PIIA, Postman agreed to the following confidentiality restrictions:

> 2.     I agree that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business affairs, including its inventions, products, processes, projects, developments, and plans are and shall be the property of the Company, and l will not disclose the same to unauthorized persons or use the same for any unauthorized purposes without written approval by an officer of the Company, either during or after the term of my employment, until such time as such information has become public knowledge. I also agree to treat all U. S. Government classified information and material in the manner specified by applicable Government regulations.
>
> 3.     I agree that all files, letters, memos, reports, sketches, drawings, laboratory notebooks or other written material containing matter of the type set forth in paragraph 2 above which shall come into my custody or possession shall be and are the exclusive property of the Company to be used by me only in the performance of Company duties and that all such records or copies thereof in my custody or possession shall be delivered to the Company upon termination of my employment.
>
> 4.     I agree that my obligation not to disclose or to use proprietary or confidential information of the types set forth in paragraphs 2 and 3 above also extends to such types of information of customers of the Company or suppliers to the Company who may have disclosed or entrusted such information to the Company or me in the course of business.
>
> (Ex. F, Postman Agreement ¶¶ 2-4.)

100.     On or about March 28, 2013, Postman signed a second proprietary information and inventions agreement with Varian ("Postman 2013 PIIA"), a true and correct copy of which is attached as **Exhibit G**.

22

101.    Pursuant to the Postman 2013 PIIA, Postman agreed to the following confidentiality restrictions:

> 2.    I agree that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business affairs, including it's inventions, products, personnel, processes, projects, developments and plans are and shall be the property of the Company, and I will not disclose the same to unauthorized persons or use the same for any unauthorized purposes without written approval by an officer of the Company, either during or after the term of my employment, until such time as such information has become public knowledge.
>
> 3.    I agree that all files, letters, memos, reports, sketches, drawings, laboratory notebooks or other written material containing matter of the type set forth in paragraph 2 above which shall come into my custody or possession shall be and are the exclusive property of the Company to be used by me only in the performance of Company duties and that all such records or copies thereof in my custody or possession shall be delivered to the Company upon termination of my employment.
>
> 4.    I agree that my obligation not to disclose or to use proprietary or confidential information of the types set forth in paragraph 2 and 3 above also extends to confidential or non-public information disclosed by or concerning customers of the Company, suppliers to the Company or other third parties that was disclosed or entrusted to the Company or me in the course of business.
>
> 5.    In addition to the foregoing, I will not disclose to the Company or induce the Company or any other person or entity to use any confidential information or material in violation of the rights of the Company or of any of my former employers.
> ...

(Ex. G, Postman 2013 PIIA, ¶¶ 2–5.)

102.    Postman had access to confidential, proprietary and trade secret information related to Varian's products, including the Snowbird X-ray tube, including Varex Trade Secrets.  Specifically, Postman had access to the design, development and research related to the Snowbird.  Examples of such trade secret information include:

Highly confidential customer specifications;

Snowbird's thermocouple temperature profiles of air bake and vacuum bake ovens;

Snowbird parts cleaning processes to reduce particle count, including writing the process documentation;

Tooling to protect components against oxidation during bakeout;

Snowbird target design;

Snowbird brazing processes;

Snowbird testing processes;

Design and development of Snowbird's aperture;

Snowbird's build schedule;

Snowbird bearing design and finishes; and

Design and development of the Snowbird anode including discussions of the target support assembly, integral target stem assembly, use of coated bearings, welding, and anode assembly firing research and development.

103.    During the course of his employment at Varian, Postman had access to significant amounts of proprietary and confidential documents and information that constitute Varex Trade Secrets.

104.    On or about  March 30, 2013, Postman terminated his employment with Varian.

105.    Postman had an exit interview when he left Varian, during which he was instructed to return confidential information in his possession, was given copies of his signed proprietary information and inventions agreements, and was reminded of his confidentiality obligations.

24

106.     Postman signed a 2012 Voluntary Enhanced Retirement Program Statement ("Postman Retirement Agreement") on or about March 28, 2013, in which he agreed that he would not "...disclose to others any confidential or proprietary information regarding Varian's practices, policies, procedures, business and manufacturing processes, trade secrets, patents, products, Research and Development efforts, customer lists, price lists, marketing and sales plans, company financials, employees, vendors and suppliers or other nonpublic information concerning Varian's business affairs which [he] obtained during the course of your employment with Varian. (Postman Retirement Agreement ¶ 7.)

107.     He further agreed that he would "...comply with the terms contained in any agreement you entered with Varian that continue to apply after your employment by Varian ends, including, but not limited to, those that protect information that is confidential, proprietary or related to patient health."  (*Id.* ¶ 8.)

108.     Postman also signed an Employee Termination Statement ("Postman Termination Statement") on March 28, 2013, a true and correct copy of which is attached as **Exhibit H**. In it, he certified that he did not have in "my possession or control and that I have not taken or will not take from the Company premises, or, if taken, have returned any and all Company property and/or proprietary information, which includes but is not limited to products, tools, inventory, or proprietary copies thereof including engineering notebooks, patent applications, or dockets, technical or other type reports, contracts, purchase orders, prints, drawings, specifications or other printed or written material, whether or not prepared by me, which is not generally available to the public. I further agree not to disclose any information or data, which is proprietary to the Company and is not generally available to the public." (Ex. H, Postman Termination Statement ¶ A.)

25

109.    He further agreed, "not to disclose any information or data, which is proprietary to the Company and is not generally available to the public[.]" *Id*.

110.    On information and belief, Postman received training from Varian regarding what constituted confidential information relating to the manufacturing of the Snowbird (including the Varex Trade Secrets).

**JERALD OLSEN**

111.    Jerald Olsen ("Olsen") was employed by Varian and Varex as the Global Sales Manager of Industrial X-ray Products from 2011 to 2018.

112.    During this time Mr. Olsen had direct knowledge of Varian's sales practices and relationships concerning X-ray tube sales.  He also had knowledge concerning the profitability of the Snowbird X-ray tube and its relationship with Toshiba.

113.    In his role at Varian, Olsen had access to Varex Trade Secrets. These Varex Trade Secrets were disclosed in confidence to Olsen during the course of his employment with Varian and Varex.

114.    Olsen was aware that these Varex Trade Secrets were confidential, proprietary information.  Olsen knew or had reason to know of his duty to Varex to maintain the secrecy of this information, even after terminating his employment with Varex.

115.    Olsen assisted Ed Richardson and RELL in recruiting Varian and Varex engineers to join RELL.  On information and belief, Ed Richardson and RELL sought Varian and Varex engineers based on their knowledge of Varex Trade Secrets to facilitate RELL's manufacturing of the ALTA750 (in improper reliance on Varex Trade Secrets) to directly compete with Varex.

26

## VAREX AND RELL ARE DIRECT COMPETITORS

116.     Varex and RELL are direct competitors in the manufacture of X-ray tubes for use in Canon CT scanners.

117.     Parties are direct competitors when they offer the same type of product in the market.

118.     RELL introduced the ALTA750 X-ray tube as a substitute for Varex's Snowbird X-ray tube, targeting the same end-users—companies or individuals considering a replacement X-ray tube for a Canon Aquilion CT scanner.

119.     Starting with its May 31, 2018 press release and progressing to promotions such as its website description of the ALTA750, an interview, and other promotions, RELL has repeatedly told customers RELL is making a product specifically designed as an alternative to Varex's Snowbird tube—even mentioning Varex and the Varex part number.

120.     An end user will select a Snowbird X-ray tube or an ALTA750 X-ray tube because both with work in a Canon Aquilion CT scanner.

121.     RELL decided to manufacture and sell the ALTA750 because its most frequent request from customers was to provide a third-party alternative to the Snowbird X-ray tube. (*See, e.g.,* **Exhibit I,** Transcript of Richardson Electronics Interview, *available at* https://www.youtube.com/watch?v=l_2b73V4K-s, at 8:5–11.)

122.     On February 19, 2019, RELL represented to the Court, without citation to the record, "it is undisputed that Varex and Richardson do not directly compete." (Dkt. 69 at 10.)  This statement incorrect both because the issue was disputed and the parties do in fact directly compete..

123.    In his January 17, 2019 deposition, Ed Richardson referred to Varex as "█ █████."

124.    In an April 9, 2020 call with investors, Ed Richardson stated, "That's why we got into the CT manufacturing business to compete with Varex and Canon for the replacement business at a much higher margin than is possible in the OEM business." A true and correct copy of the transcript of that call is attached hereto as **Exhibit O**.

**RELL'S INFRINGEMENT OF VAREX'S PATENT RIGHTS**

125.    The ALTA750 was the first all-new CT tube coming from RELL. (*Id*. at 2:17-18.)

126.    The ALTA750 X-ray tube is shown below:



127.    RELL abandoned its attempts to repair spent Varex Snowbird X-ray tubes. Instead, RELL manufactures the ALTA750 as a new article through the combination of used and new components. (Dkt. 13, Dr. Bani-Hashemi Decl., ¶¶ 191–197, 200.)

128.    RELL goes through the same manufacturing process steps, including cleaning, vacuuming, and seasoning, for the ALTA750 X-ray tube regardless of whether components used therein are new or recycled. In scavenging parts from spent Snowbird X-ray tubes, RELL does not attempt to maintain the integrity of the Snowbird X-ray tube or

repair only those internal parts that it can identify as having failed. Each ALTA750 X-ray is its own manufacture. To the extent that Snowbird X-ray tube parts may be incorporated, this is due to a desire to reduce costs by scavenging reusable parts, not as an attempt to extend the remaining life for a Snowbird X-ray tube that is no longer functioning due to internal component wear and/or failure.

129.    RELL manufactures and has sourced for RELL components for an ALTA750 manufacture, including vacuum enclosures, bearing assemblies, and electron sources that have the same dimensions as the analogous Varex components used in the Snowbird X-ray tube. RELL also manufactures its own shield structure in the ALTA750 product that is integrated with its own vacuum enclosure, bearing assembly, and electron source. (*Id.*, ¶¶ 72–74, 83–85, 93, 94.)

130.    RELL obtains used Snowbird X-ray tubes, cuts open the Snowbird X-ray tube destroying the vacuum enclosure and shield structure, and removes used anode assemblies and thermal disks. Components of the Snowbird X-ray tube other than the anode assembly and thermal disk are disposed of regardless of whether they are in working condition.

131.    RELL combines the parts scavenged from the Varex Snowbird X-ray tube with its newly manufactured components within an enclosure, which is then processed to ensure that the enclosed components operate in a vacuum. (*Id.*, ¶¶ 74–96.)

132.    In making the ALTA750 product, RELL conducts a manufacturing process including cleaning, bake-out, frame assembly, brazing, welding, vacuum preparation, and seasoning, starting from individual parts.  RELL sources its own frame (vacuum enclosure) to which all parts are affixed via brazing and/or welding.

133.    The ALTA750 X-ray tube is placed in a used Varex Snowbird X-ray tube housing, which is principally used as a barrier against radiation emitted from the X-ray tube, as shown below with added-on RELL stickers:



134.    The ALTA750 includes dielectric oil within the housing surrounding the X-ray tube. (*Id.*, ¶¶ 77–79.)

135.    The ALTA750 incorporates a second coolant composed of a mixture of propylene glycol and water that travels through the shield structure manufactured by RELL and a thermal disk that RELL salvages from used Snowbird X-ray tubes. (*Id.*, ¶¶ 74, 80–82, 104, 105.)

136.    Aware of Varex's patents, RELL nonetheless is attempting to obtain a foothold in the CT scanner X-ray tube market through misappropriation of Varex's intellectual property.

137.    Even the name chosen by RELL for its knock-off X-ray tube—the ALTA750—is an attempt to exploit Varex's intellectual property and goodwill.

138.    The ALTA750 X-ray tube sold by RELL is not a Snowbird X-ray tube previously sold by Varex. The ALTA750 X-ray tube is a knock-off of the Snowbird X-ray tube, newly manufactured to compete with the OEM Snowbird X-ray tubes sold by Varex to Canon.

139.     RELL's business process in manufacturing ALTA750 X-ray tubes is based on procuring spent Snowbird X-ray tubes and dissecting those spent X-ray tubes to identify parts that can be reused. RELL does not even attempt to make a spent Snowbird X-ray tube functional for continued use.  RELL previously attempted to repair Snowbird X-ray tubes, but the results were unsatisfactory, and instead turned all of its efforts into making RELL's self-described "NEW tube," which eventually became known as the ALTA750.

140.     While certain components are scavenged from used Snowbird X-ray tubes, the ALTA750 X-ray tube is a distinct and separate article of manufacture. The nature of the actions RELL takes to create the ALTA750 is to make a new product, a second creation of the patented article. RELL creates an entirely new enclosure, bearing assembly, and other components, and then heats and evacuates the assembly to create vacuum, because it is more practical and efficient to simply create a new X-ray tube. The requirements of maintaining a vacuum within the X-ray tube alone suggest that attempts at repairing a used Snowbird X-ray tube by cutting it open, identifying the faulty component, replacing the component, and resealing the vacuum enclosure would be much more challenging than simply scavenging parts that can be reused and building a new X-ray tube. (*Id.*, ¶ 196.)

141.     None of the scavenged parts alone or in combination with other parts scavenged by RELL from used Snowbird X-ray tubes (namely, the housing, the anode assembly, and the thermal disk) provide all the elements of any of the asserted claims. (*Id.*, ¶ 197.)

142.     For example, the vacuum enclosure, an element of at least claim 1 of the '692 patent, is entirely new, machined by or made for RELL. While it is designed to be a copy of the Snowbird X-ray tube vacuum enclosure, it is a wholly new component. The size and

dimensions of the ALTA750's vacuum enclosure are identical to those of Varex's Snowbird. (*Id.*, ¶¶ 72, 73, 122, 123.)

143.    The vacuum enclosure is a necessary component of any X-ray tube. RELL creates a wholly new vacuum-enclosed X-ray tube that has never been sold by anyone previously. (*Id.*, ¶¶ 72, 73, 123, 195.)

144.    When RELL newly manufactures its X-ray tube, RELL supplies a new electron source, an element of at least claim 1 of the '692 patent. (*Id.*, ¶¶ 74, 123–25.)

145.    When RELL newly manufactures its X-ray tube, RELL supplies a new bearing assembly and disposes it within its X-ray tube such that it rotatably supports the rotor and is at least partially received within the tube's anode, an element of at least claim 1 of the '692 patent. (*Id.*, ¶¶ 93, 106, 128, 131.)

146.    When RELL newly manufactures its X-ray tube, RELL deposits its new dielectric oil into the housing and its new propylene/glycol mixture to circulate within the vacuum-enclosed portion of the X-ray tube, as recited in at least claim 34 of the '317 patent. (*Id.*, ¶¶ 101, 104, 105.)

147.    When RELL newly manufactures its X-ray tube, RELL machines a new shield structure and assembles it between the X-ray tube's anode and the electron source newly machined by RELL, as recited in at least claim 34 of the '317 patent. However, RELL omits the separately patented external fins on the shield structure that Varex employs in the Snowbird X-ray tube for improved heat dissipation. RELL's shield structure is entirely new, machined by RELL. (*Id.*, ¶¶ 72, 73, 94, 95, 103.)

148.    Shown below are a Varex MCS-7078D "Snowbird" X-ray tube on the left and a RELL ALTA750 X-ray tube on the right.  (*Id.*, ¶¶ 73.)



149.     The ALTA750 X-ray tube is a blatant copy in many respects, but it is not a Snowbird X-ray tube. ALTA750 X-ray tubes have not been previously sold by Varex nor does RELL present the ALTA750 X-ray tube to customers as repair, modification, or remanufacture of Snowbird X-ray tubes.

150.     RELL has repeatedly admitted that its ALTA750 X-ray tube is a newly manufactured replacement tube.

151.     As of October 15, the date on which Varex filed its original complaint, RELL advertised that "[t]he ALTA750 is a new CT tube specifically designed for use as a replacement tube for the Toshiba/Canon Medical Systems CXB-750D/4A tube, also known as the Varex Imaging MCS-7078." (Attached hereto as **Exhibit J** are true and correct screenshots of pages from RELL's website as of October 15, 2018.)

152.     RELL promoted the ALTA750 as a "form, fit and function replacement for . . . the Varex Imaging MCS-7078 tube." (Ex. J at 1; *see also* Ex. I at 9:2–4.)

153.     RELL further advertised the ALTA750 as a "newly manufactured" X-ray tube. (Ex. J at 2; *accord* Ex. I at 3:8–4:1.)

154.     There is no recognized industry or market for repair of Snowbird X-ray tubes in which a service provider identifies a worn component within a Snowbird X-ray tube, replaces that component, and then returns the Snowbird X-ray tube to its owner.

155.     RELL does not attempt to identify and repair only those parts needing replacement in making the ALTA750 X-ray tube. RELL admits that it scraps the entire tube frame, bearings, filaments from the spent Snowbird tube regardless of whether they are capable of reuse. (*See* Dkt. 32, Ex. H, ¶¶ 14, 17.)

156.     After Varex filed its original Complaint in this action, RELL attempted to hide these admissions fatal to its proposed affirmative defense of patent exhaustion by scrubbing them from its website. (Attached hereto as **Exhibit K** are true and correct screenshots of pages from RELL's website as of November 1, 2018.)

157.     A comparison of the RELL website as of October 15, 2018 and November 1, 2018 is shown below.

**https://www.rellhealthcare.com/ALTA750**

|  October 15, 2018 | November 1, 2018 |
|---|---|

**OVERVIEW**

+ Designed to meet or exceed the performance of the original OEM tube.
+ A newly manufactured Richardson Healthcare ALTA750 replacement vacuum tube assembly is loaded into an OEM housing, to ensure full compatibility with the OEM CT system.
+ FDA Registered
+ The ALTA750 comes with a warranty period of 12 months or 200,000 rotations, whichever comes first.
+ For a limited time, we will provide a 90-day Complete Satisfaction Guarantee: Customers for the ALTA750 will receive a 90-day, no questions asked, Complete Satisfaction Guarantee on their first tube purchased! Ask us for more details.
+ The new ALTA750 tube is also available through our P3 Preferred Parts Partnership program. Contact us for more information about our P3 options and a quote today!

**OVERVIEW**

+ Designed to meet or exceed the performance of the original OEM tube.
+ The Richardson Healthcare ALTA750 replacement vacuum tube assembly is loaded into an OEM housing, to ensure full compatibility with the OEM CT system.
+ FDA Registered.
+ The ALTA750 comes with a warranty period of 12 months or 200,000 rotations, whichever comes first.
+ For a limited time, we will provide a 90-day Complete Satisfaction Guarantee: Customers for the ALTA750 will receive a 90-day, no questions asked, Complete Satisfaction Guarantee on their first tube purchased! Ask us for more details.
+ The ALTA750 tube is also available through our P3 Preferred Parts Partnership program. Contact us for more information about our P3 options and a quote today!

|  Date Varex Files Complaint | Date of Richardson's Motion to Dismiss |
|---|---|

**https://www.rellhealthcare.com/store/ALTA750**

|  October 15, 2018 | November 1, 2018 |
|---|---|

The ALTA750 is a new CT tube specifically designed for use as a replacement tube for the Toshiba/Canon Medical Systems CXB-750D/4A* tube, also known as the Varex Imaging MCS-7078*.

Qty: 1    ADD TO QUOTE

The ALTA750 CT tube is specifically designed for use as a form-fit-function replacement tube for the Toshiba/Canon Medical Systems CXB-750D/4A* tube, also known as the Varex Imaging MCS-7078*.

Qty: 1    ADD TO QUOTE

|  Date Varex Files Complaint | Date of Richardson's Motion to Dismiss |
|---|---|

158.   Notwithstanding its removal of "newly manufactured" and "new" RELL still promotes the ALTA750 as a "replacement" for Varex's MCS-7078 Snowbird X-ray tube. (Ex. J; Ex. K.)

159.   RELL, during its October 11, 2018 earnings call, stated:

> We are increasingly selling **new** ALTA tubes instead of certified pre-owned OEM tubes, but we still see a market for pre-owned tubes going forward and we'll continue to offer these as an option for customers who do not have the budget for a new [tube].

(**Exhibit L,** transcript of Richardson Q1 2019 Results – Earnings Call, available at https://seekingalpha.com/article/4211213-richardson-electronics-ltd-rell-ceo-edward-richardson-q1-2019-results-earnings-call (last accessed November 27, 2018), at 9 (emphasis added).)

160.    In contrast to those "certified pre-owned OEM tubes" that are resold by RELL, the ALTA750 is a new tube that carries a higher price because it is a new piece of equipment, not a used tube. (*Id.*)

161.    During that same earnings call, RELL stated:

> I'm happy to report that we began shipments of our **newly manufactured** CT tube, the ALTA750 for revenue during the first quarter.
>
> . . .
>
> To be clear, we don't intend to compete with our third party service partners but in these instances we are bringing good business opportunities to them and it has been well received.

(*Id.* at 7, 8 (emphasis added).)

162.    Further, in its July 26, 2018 earnings call, RELL explained:

> At the end of the quarter, our Healthcare Group announced the launch of our new CT tube, the ALTA750, which is a **replacement** for the Toshiba Cannon Medical Systems CXB750D. Up until now, there's been no third-party tube available to **replace** the CXB750D. This was a huge milestone for the company. Richardson Electronics is now part of a very elite group of global companies with the engineering and **manufacturing expertise capable of producing new CT tubes**.

(**Exhibit M,** transcript of Richardson Q4 2018 Results – Earnings Call, https://seekingalpha.com/article/4191569-richardson-electronics-ltd-rell-ceo-edward-richardson-q4-2018-results-earnings-call (last accessed November 27, 2018), at 2 (emphasis added).)

163.    The ALTA750 is not a repair, refurbishment, restoration, resale, or remanufacture of the Snowbird X-ray tube. It is a new article of manufacture that is designed as a replacement for the Snowbird X-ray tube. (*See generally* Exs. E–M.)

164.    RELL has never advertised the ALTA750 as a repaired or reconditioned X-ray tube, a refurbished X-ray tube, a restored X-ray tube, a resold X-ray tube, or a remanufactured X-ray tube. The ALTA750 X-ray tube sold by RELL is a new article of manufacture; it is not a Snowbird X-ray tube that was previously sold by Varex.

165.    Instead of developing its own technology, RELL obtained one or more samples of Varex's Snowbird X-ray tube, which RELL reverse engineered. RELL also hired ex-Varian employees with detailed knowledge of Snowbird X-ray tube components. RELL's efforts to reverse engineer the Snowbird alone would not have supplied RELL with all the information necessary to design and manufacture the ALTA750, because there is critical design and manufacturing process information that is not revealed by observation.

166.    None of the components reused by RELL themselves read on the Asserted Claims.

## RELL'S MISAPPROPRIATION OF VAREX TRADE SECRETS

### THE VAREX SNOWBIRD X-TUBE DOES NOT DISCLOSE VAREX TRADE SECRETS

167.    Reverse engineering of a Varex Snowbird X-ray tube does not disclose Varex's Trade Secrets.

168.    For example, the manner in which components have to be cleaned and processed to be usable in a new X-ray tube manufacture are proprietary and confidential. While X-ray tube manufacturers may each have their own processes, each is the result of years of iterative work and is confidential to each manufacturer. Varex's processes are not discernable through reverse engineering of a Snowbird X-ray tube and are not shared with other X-ray tube manufacturers.

169.    Additionally, Varex's particular heating and timing techniques utilized in the manufacturing of tubes is also proprietary and confidential, cannot be deduced by reverse engineering, and are not shared with other X-ray tube manufacturers.

170.    Neither the '317 patent nor the '692 patent discloses the Varex Trade Secrets.

### KLUGE'S COMMUNICATIONS WITH RELL

171.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

172.    Kluge disclosed Varex Trade Secrets to RELL without either Varian's or Varex's implied or express consent, including without limitation Varex Trade Secrets relating to the design and manufacturing of the Snowbird. Because of the nature of his position and responsibilities, Kluge also necessarily and inevitably disclosed Varex Trade Secrets to RELL.

173. ███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████.

174. ███████████████████████████████████████
███████████████████████████████████████
███

175. ███████████████████████████████████
███████████████████████

176. ██████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
██████████████████

177. ████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████is.

178. ████████████████████████████████████
███████████████████████████████████████
█████████████████████████████

179. A portion of Ms. Diddell's ██████████ notes ████████████████ is reproduced below:



It is not possible for Kluge to have supplied this information, along with other information, without relying on his knowledge of Varex Trade Secrets.

180.    On information and belief, Kluge recruited Postman and Lee to assist RELL in developing the ALTA750, and specifically targeted them for recruitment because he knew that their knowledge of Varex Trade Secrets would be valuable to RELL.

181.    ███████████████████████████████

███████████████████████████████████████

███████████████████████

182.    On or about October 2017, Kluge joined RELL's Board of Directors ("Board"). On information and belief, RELL has since solicited and utilized Kluge's knowledge of Varian Trade Secrets including his knowledge of the design and development of the Snowbird X-ray Tube.

183.    As a member of RELL's Board, Kluge has stock purchase options that he can exercise if he elects to do so. (Dkt. 135 at Ex. I, ¶ 6.)

## POSTMAN'S CONSULTANT ENGAGEMENT WITH RELL

184.    

185.

186.    Postman was hired as a consultant because of his inside knowledge of Varex's Snowbird tube and Varex's Trade Secrets. As a consultant, Postman directly disclosed Varex Trade Secrets to RELL without either Varian's or Varex's implied or express consent.

187.    Because of the nature of his position and responsibilities, Postman also necessarily and inevitably disclosed Varex Trade Secrets to RELL.

188.    In multiple meetings and discussions, Postman disclosed Varex Trade Secrets, including trade secrets related to minimizing particle count within the X-ray tubes, bake out procedures, target design and reusability, components were most likely to fail earlier, brazing techniques, machining and reusability of cooling blocks, and techniques for applying welding to particular components to maintain their intended orientation to one another.

189.    In his reports, Postman specifically addressed ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Postman learned this Varex Trade Secret information from

his work on and access to Varex Trade Secrets regarding the Snowbird tube while employed

at Varex.

## LEE'S CONSULTANT ENGAGEMENT WITH RICHARDSON

190.    ███████████████████████████████████████████

████████████████████████████████████████████ a position in which he

cannot operate or function without relying on Varex Trade Secrets. ███████████████

██████████████████████████████████████.

191.    ███████████████████████████████████████

████████████████████████████████████████████

██████████████████.

192.    ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████

193. 

194. Lee was hired as a consultant because of his inside knowledge of Varex's Snowbird tube and Varex's Trade Secrets. As a consultant, Lee directly disclosed Varex Trade Secrets to RELL without either Varian's or Varex's implied or express consent.

195. Because of the nature of his position and responsibilities, Lee also necessarily and inevitably disclosed Varex Trade Secrets to RELL.

196. In a ▆▆▆▆▆▆▆ report to Ed Richardson and Wendy Diddell, Lee explained:



197. Part of the manner in which Lee and Postman enabled RELL to bring the ALTA750 to that market in an accelerated manner was through divulging Varex Trade Secrets.

198. Related to his consultancy on the ALTA750 project, Lee explained, ▆▆▆▆▆▆

199. Lee also confirmed that RELL's CT project involved ▆▆▆▆▆▆

██████████████████████████████████████████████

████████████

200.    On the course of various meetings and discussions, Lee disclosed Varex Trade Secrets, including trade secrets related to ████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████ Lee learned this Varex Trade Secret information from his work on and access to Varex Trade Secrets regarding the Snowbird tube while employed at Varian.

201.    Lee improperly kept a copy of the confidential MCS-7078D X-ray tube specification for Toshiba CT Scanner and divulged trade secret information from the specification to RELL. This specification contains Varex Trade Secrets that were subject to Varian's and Varex's reasonable measures taken to keep the underlying information secret.

202.    In response to an email regarding ██████████████████████████████

████████████████, Lee stated, ██████████████████████████████████████

████████████████████████ and copied into an email, information from the specification, including confidential information relating to █████████████████████

███████████████████████████████████ Lee also forwarded this information to Diddell via email.

**OLSEN'S EMPLOYMENT WITH RELL**

203.    In or about 2018, RELL hired Olsen as a Vice President of Sales and Marketing in RELL's Healthcare Division.  RELL was aware that Olsen was currently employed at Varex when RELL hired him into this role.

204.    On information and belief, while working at RELL, Olsen provided RELL with confidential, proprietary Varex Trade Secrets. ███████████████████████

███████████████████████████████████████████

████████████████████████████████████

**RELL DELIBERATELY SOLICITED DISCLOSURE OF VAREX TRADE SECRETS**

205.    ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████

206.    RELL deliberately sought Varex Trade Secret information, inducing Lee, Postman and Kluge to disclose such information to RELL. RELL knew or had reason to know that the misappropriation of these Varex Trade Secrets was improper and in breach of Lee, Postman and Kluge's confidentiality obligations to Varex.  RELL willfully solicited Varex Trade Secrets and improperly used the Varex Trade Secrets to facilitate and speed up the development of its ALTA750 X-ray Tube.

207.    ████████████████████████████████████

████████████████████████████████████████████████

████████ Ed Richardson, Diddell, and Muchowicz solicited Kluge, Postman, and Lee to disclose Varex Trade Secrets to RELL.

208.    For example, ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

209.    Ed Richardson ████████████████████████████

█████████████████████████████████████████████████

████████████████████

210.    Postman responded ████████████████████████████

████████████████████████████████████████████████.

211.    Emblematic of Ed Richardson's desire to utilize former Varex employees to obtain Varex Trade Secrets is his ████████████ email to Wendy Diddell.

212.    On January 24, 2018, Wendy Diddell emailed Ed Richardson, reporting that

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████

213.    Ed Richardson responded to the email, "████████████████████

████████████████████"

214.    Muchowicz ████████████████, asked Lee via email, "████████████

█████████████████████████████████████████████████████

215. Muchowicz ████████████████ also expressed interest in an ████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████ .

216. RELL knew the information obtained from Postman, Lee and Kluge was confidential, proprietary, Varex Trade Secret information. This is evidenced by █
████████████████████████████████████████████ .

217. ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████ at least Jonaitis would recognize Lee and Postman, ████████████████████████████ .

218. In his response, Lee noted that ████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████ .

219. ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

220.    Ed Richardson informed investors that he was aware from conversations with Kluge that it took years for Varex to get the Snowbird X-ray tube "to market on a reliable basis."  RELL had never manufactured an X-ray tube prior to the ALTA750.  On information and belief, RELL and Ed Richardson chose to hire Lee and Postman and coordinated with Kluge to obtain inside knowledge of Varex's operations in developing, manufacturing, and selling the Snowbird tube so as  make it possible (or at a minimum to reduce the otherwise long lead time it would take) to develop its own processes.  RELL knew that it would be likely to obtain Varex Trade Secrets in the process and encouraged their disclosure by Kluge, Lee, Postman.  On information and belief, RELL sought to obtain other Varex Trade Secrets from Olsen and other current and/or former employees.

## COUNT I

## Infringement of U.S. Patent No. 6,456,692

221.    Varex repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

222.    The USPTO duly and legally issued the '692 patent on September 24, 2002.  Varex is the legal owner of the '692 patent.

223.    RELL has infringed and continues to infringe at least claims 1, 3, 6, 7, and 12 of the '692 patent in violation of 35 U.S.C. § 271(a).

224.    Exemplary claim 1 of the '692 patent is reproduced below:

An x-ray tube comprising:

a vacuum enclosure having an electron source and anode disposed therein, said anode having a target surface positioned to receive electrons emitted by said electron source;

a rotor at least partially received within said anode, and wherein the rotor is operably connected to the anode;

a bearing assembly rotatably supporting said rotor and at least partially received within said anode so that said rotor is at least partially interposed between said bearing assembly and said anode; and

an emissive coating disposed on at least a portion of said rotor that is disposed within the anode, the coating being comprised of a material that increases the emissivity of the rotor surface.

225.    RELL's ALTA750 X-ray tube incorporating a newly manufactured bearing assembly, electron source, and vacuum enclosure with a target anode assembly taken from a used Varex Snowbird X-ray tube, includes all of the elements claims 1, 6, 7 and 12 of the '692 patent.

226.    RELL's ALTA750 X-ray tube incorporating a newly manufactured bearing assembly, electron source, and vacuum enclosure with a target anode assembly and thermal disk taken from a used Varex Snowbird X-ray tube, includes all of the elements claim 3 of the '692 patent.

227.    The ALTA750 X-ray tube is manufactured as a new article, including a new vacuum enclosure and a new bearing assembly that are brazed together with other components, such as new fluid pathway components and a new electron source, that undergoes extensive evacuation and heating procedures. The ALTA750 undergoes the new manufacturing process required to create the requisite vacuum conditions within the tube using new components that are included regardless of whether recycled components are in sufficient condition to be repurposed from a used X-ray tube.

228.    RELL does not utilize any portion of the Varex Snowbird X-ray tube vacuum enclosure, bearing assembly, shield structure, or electron source in making the ALTA750, even if those parts were in acceptable working condition. These parts are reverse engineered and sourced from RELL to make a "new" "replacement" tube as an alternative to the OEM product.

229.    RELL had actual knowledge of the '692 patent, but nonetheless chose to make, use, sell, and offer for sale the ALTA750.

230.    RELL has directly infringed and continues to infringe one or more claims of the '692 patent, either literally or under the doctrine of equivalents, as a result of RELL making, using, importing, selling, and/or offering for sale infringing products, including the ALTA750, without the permission, consent, authorization, or license of Varex.

231.    As a result of RELL's unlawful activities, Varex has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law unless and until infringement is enjoined by this Court. Varex is entitled to preliminary and permanent injunctive relief in accordance with 35 U.S.C. §§ 271, 281, and 283.

232.    RELL's infringement of the '692 patent has also injured and continues to injure Varex in an amount to be proven at trial, but not less than a reasonable royalty in accordance with 35 U.S.C. §§ 271, 281, and 284.

233.    RELL has been aware of Varex's patents, including the '692 patent, and has nonetheless continued its infringing activity. Despite its knowledge of Varex's patent portfolio and the Asserted Patents, RELL has sold and continues to sell the Accused Products in complete and reckless disregard of Varex's rights. Accordingly, RELL has acted recklessly and continues to willfully, wantonly, and deliberately engage in acts of

50

infringement of the '692 patent, justifying an award to Varex of enhanced damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## COUNT II

### Infringement of U.S. Patent No. 6,519,317

234.    Varex repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

235.    The USPTO duly and legally issued the '317 patent on February 11, 2003. Varex is the legal owner of the '317 patent.

236.    RELL has infringed and continues to infringe at least claims 34–37 of the '317 patent in violation of 35 U.S.C. § 271(a) and (b).

237.    Exemplary claim 34 is reproduced below:

An x-ray device, comprising:

(a) an x-ray tube substantially disposed within a housing; and

(b) a cooling system, the cooling system including:

(i) a first coolant disposed in the housing so that at least a portion of heat dissipated by the x-ray tube is absorbed by the first coolant; and

(ii) at least one fluid passageway capable of directing a flow of a second coolant proximate to at least a portion of the x-ray tube so that at least a portion of heat dissipated by the x-ray tube is absorbed by the second coolant, the at least one fluid passageway being at least partially defined in a shield structure disposed between a target anode and an electron source of said x-ray tube.

238.    RELL's ALTA750 X-ray tube incorporating a newly manufactured X-ray tube including a passageway partially defined in a shield structure manufactured by RELL that is disposed between the target anode taken from a Varex Snowbird X-ray tube and an electron source procured by RELL, along with first and second coolants provided by RELL,

51

and RELL's placement of these components within a Varex external housing, includes all of the elements of claims 34, 36, and 37 of the '317 patent.

239. RELL's ALTA750 X-ray tube incorporating a newly manufactured X-ray tube including a passageway partially defined in a shield structure manufactured by RELL that is disposed between the target anode taken from a Varex Snowbird X-ray tube and an electron source procured by RELL, Varex's thermal disk connected to RELL's newly manufactured shield structure, first and second coolants provided by RELL, and RELL's placement of these components within a Varex external housing, includes all of the elements of claim 35 of the '317 patent.

240. The ALTA750 X-ray tube is manufactured as a new article, including a new vacuum enclosure and a new shield structure that are brazed together with other components, such as new fluid pathway components, bearing assembly, and a new electron source, that undergoes extensive evacuation and heating procedures. The ALTA750 undergoes the new manufacturing process required to create the requisite vacuum conditions within the tube using new components that are included regardless of whether recycled components are in sufficient condition to be repurposed from a used X-ray tube.

241. RELL does not utilize any portion of the Varex Snowbird X-ray tube vacuum enclosure, bearing assembly, or shield structure, even if those parts were in acceptable working condition. These parts are reverse engineered and sourced by RELL to make a "new" "replacement" tube as an alternative to the OEM product.

242. RELL had actual knowledge of the '317 patent prior to introducing the ALTA750 for commercial sale on or about June 2018.

243.     RELL has directly infringed and continues to directly infringe, either literally or under the doctrine of equivalents, as a result of RELL making, using, importing, selling, and/or offering for sale infringing products, including the ALTA750, without the permission, consent, authorization, or license of Varex.

244.     RELL has actively and knowingly induced, and continues to actively and knowingly induce, the infringement of one or more claims of the '317 patent, either literally or under the doctrine of equivalents, as a result of RELL instructing, directing, and/or requiring others, including its customers, purchasers, and users, to perform the steps of the claimed methods or combine the requisite claim elements, resulting in direct infringement.

245.     RELL offers to the engineers of its customers, purchasers, and users "resources to support you as you prepare to enter the Toshiba CT service market." (*See* **Exhibit N**, Toshiba CT Training – US, *available at* https://www.rellhealthcare.com/training-us (last accessed at October 15, 2018) at 1.) RELL's program provides training in, among other things, "[s]ystem operation," "[c]alibration," "[d]iagnostic procedures," and "[t]roubleshooting" to ensure that its customers, purchasers, and users practice the claims of the '317 patent. (*Id.*)

246.     As a result of RELL's unlawful activities, Varex has suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law unless and until infringement is enjoined by this Court. Varex is entitled to preliminary and permanent injunctive relief in accordance with 35 U.S.C. §§ 271, 281, and 283.

247.     RELL's infringement of the '317 patent has also injured and continues to injure Varex in an amount to be proven at trial, but not less than a reasonable royalty in accordance with 35 U.S.C. §§ 271, 281, and 284.

248. RELL has been aware of Varex's patents, including the '317 patent, and has nonetheless continued its infringing activity. Despite its knowledge of Varex's patent portfolio and the Asserted Patents, RELL has sold and continues to sell the Accused Products in complete and reckless disregard of Varex's rights. Accordingly, RELL has acted recklessly and continues to willfully, wantonly, and deliberately engage in acts of infringement of the '317 patent, justifying an award to Varex of enhanced damages under 35 U.S.C. § 284, and attorneys' fees and costs incurred under 35 U.S.C. § 285.

## COUNT III

## Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836

249. Varex repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

250. The Varex Trade Secrets are Varex's protectible trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836. Considerable time and resources were expended developing, refining, and/or compiling the Varex Trade Secrets.

251. The Varex Trade Secrets relate to the design and manufacture of X-ray imaging components that are used, sold, shipped, and/or ordered in, or intended to be used, sold, shipped, and/or ordered in, interstate or foreign commerce within the meaning of Section 1836(b)(1) of the DTSA.

252. Varian took reasonable measures to protect and maintain the secrecy and confidentiality of the Varex Trade Secrets, including without limitation: (i) password protection to access Varian's systems containing the Varex Trade Secrets; (ii) document control procedures; (iii) restricting access to document management systems to company personnel on a need-to-know basis; (iv) providing trainings on confidential information;

54

(v) creating and implementing policies adducing the nature, character, and protection of confidential information; (vi) requiring employees, including Kluge, Lee, and Postman, to be bound to strict confidentiality obligations, including those as forth in employment agreements (*see, e.g.*, Lee PIIA, Postman 1995 PIIA, Postman 2013 PIIA.); (vii) requiring departing employees, including Kluge, Lee, and Postman, to reaffirm strict post-termination confidentiality obligations, including those as set forth in termination-related agreements (*see* Lee Separation Agreement, Lee Termination Statement, Postman Retirement Agreement, Postman Termination Statement), and (viii) requiring employees, including Kluge, Lee, and Postman, to return upon termination all materials relating to Varian's business, including trade secrets and other proprietary and confidential materials.

253.    Varex adopted these same reasonable measures after the Spin-Off from Varian and continues to take these same reasonable measures today. Neither Varian nor Varex has granted permission to reproduce, use, or disclose, in whole or in part, the Varex Trade Secrets.

254.    The Varex Trade Secrets are not generally known to anyone outside of Varex, except persons or entities bound to stringent confidentiality obligations, and their secrecy confers substantial economic advantage and benefit to Varex. Knowledge of the Varex Trade Secrets would also confer a substantial economic benefit to Varex's competitors and those seeking to compete with Varex, including RELL.

255.    Without the Varex Trade Secrets, it would take a competitor a considerable amount of time, effort, expense, and expertise to duplicate the Varex Trade Secrets, and it is unlikely that the Varex Trade Secrets could be duplicated at all without access to them.

The Varex Trade Secrets are not disclosed in the '317 or '692 patents, and they cannot be discovered simply by reverse engineering its X-ray tubes.

256. On information and belief, Kluge, Lee, and Postman obtained the Varex Trade Secrets while they were employees of Varian, and were and are bound at all times to obligations of confidentiality and non-use for Varex Trade Secrets.

257. Despite their duty to Varian (and by extension, Varex) to maintain the confidentiality of the Varex Trade Secrets, Kluge, Lee, and Postman knowingly and willfully disclosed the Varex Trade Secrets to RELL. On information and belief, Kluge, Lee, and Postman have disavowed their confidentiality obligations to Varex.

258. On information and belief, RELL acquired the Varex Trade Secrets by improper means by inducing Kluge, Lee, and Postman to breach their duty to maintain the confidentiality of the Varex Trade Secrets. Kluge, Lee, and Postman did not have Varian's or Varex's express or implied consent to disclose the Varex Trade Secrets to RELL.

259. On information and belief, RELL knew that the Varex Trade Secrets were acquired by improper means (namely, by Kluge, Lee, and Postman breaching their duty to maintain the confidentiality of the Varex Trade Secrets) when it acquired the Varex Trade Secrets from Kluge, Lee, and Postman.

260. RELL further misappropriated at least some of the Varex Trade Secrets by using the underlying information to develop the knock-off Accused Products for RELL and thereby commercially exploit the Varex Trade Secrets in competition with Varex.

261. Not only has RELL used Varex Trade Secrets previously disclosed by Kluge, Lee, and Postman, it is inevitable that Kluge, Lee, and Postman will continue to disclose

Varex Trade Secrets to RELL in violation of the DTSA, and thereby facilitate RELL's improper efforts to directly compete with Varex.

262.     On information and belief, there are not sufficient safeguards in place at RELL to prevent the disclosure of Varex Trade Secrets within RELL.

263.     On information and belief, RELL has encouraged and will continue to encourage Kluge, Postman, and Lee to disclose Varex Trade Secrets.

264.     Without intervention by the Court, additional Varex Trade Secrets will inevitably be disclosed by Kluge, Lee, and Postman to RELL.

265.     RELL's actions identified herein, as well as other acts yet to be discovered, constitute misappropriation of trade secrets under the DTSA. Because of Defendants' misappropriation of the Varex Trade Secrets, Varex is entitled to recover damages for its actual losses and for RELL's unjust enrichment pursuant to 18 U.S.C. § 1836(b)(3)(B)(i). Alternatively, in lieu of damages for actual losses and for unjust enrichment, Varex is entitled to a reasonable royalty from Defendants as a measure of its damages caused by Defendants' misappropriation of the Varex Trade Secrets pursuant to 18 U.S.C. § 1836(b)(3)(B)(ii).

266.     As a direct result of RELL's misappropriation, Varex has sustained and will continue to sustain severe and irreparable harm, damage, and injury to the value of the Varex Trade Secrets and competitive advantage, which have required significant time and resources to develop and secure.

267.     RELL knowingly, willfully, and maliciously misappropriated the Varex Trade Secrets in conscious disregard of Varex's rights in a deliberate effort to injure Varex's

business and improve its own business. Varex is entitled to recover attorney's fees and exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and (D).

268.    The competitive advantage, value, and goodwill that Varex has earned through the development and use of the Varex Trade Secrets will be lost forever if Defendants continue to misappropriate them, and such harm will continue unabated absent an injunction requiring Defendants to return and cease and desist from any use of any Varex Trade Secrets. Varex is thus entitled to injunctive relief against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(A).

## COUNT IV

## Misappropriation of Trade Secrets under Utah's Uniform Trade Secrets Act, Utah Code § 13-24-1 *et seq.* (In the Alternative to Count V)

269.    Varex repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

270.    The Varex Trade Secrets are Varex's protectible trade secrets under Utah's Uniform Trade Secrets Act ("UTSA"), Utah Code § 13-24-1 *et seq*.  Considerable time and resources were expended developing, refining, and/or compiling the Varex Trade Secrets.

271.    Varian took reasonable measures to protect and maintain the secrecy and confidentiality of the Varex Trade Secrets, including without limitation: (i) password protection to access Varian's systems containing the Varex Trade Secrets; (ii) document control procedures; (iii) restricting access to document management systems to company personnel on a need-to-know basis; (iv) providing trainings on confidential information; (v) creating and implementing policies adducing the nature, character, and protection of confidential information; (vi)  requiring employees, including Kluge, Lee, and Postman, to

be bound to strict confidentiality obligations, including those as forth in employment agreements (*see* Lee PIIA, Postman 1995 PIIA, Postman 2013 PIIA); (vii) requiring departing employees, including Kluge, Lee, and Postman, to reaffirm strict post-termination confidentiality obligations, including those as set forth in termination-related agreements (*see* Lee Separation Agreement, Lee Termination Statement, Postman Retirement Agreement, Postman Termination Statement);and (viii) requiring employees, including Kluge, Lee, and Postman, to return upon termination all materials relating to Varian's business, including trade secrets and other proprietary and confidential materials.

272. Varex adopted these same reasonable measures after the Spin-Off from Varian and continues to take these same reasonable measures today. Neither Varian nor Varex has granted permission to reproduce, use, or disclose, in whole or in part, the Varex Trade Secrets.

273. The Varex Trade Secrets are not generally known to anyone outside of Varex, except persons or entities bound to stringent confidentiality obligations, and their secrecy confers substantial economic advantage and benefit to Varex. Knowledge of the Varex Trade Secrets would also confer a substantial economic benefit to Varex's competitors and those seeking to compete with Varex, including RELL.

274. Without the Varex Trade Secrets, it would take a competitor a considerable amount of time, effort, expense, and expertise to duplicate the Varex Trade Secrets, and it is unlikely that the Varex Trade Secrets could be duplicated at all without access to them. The Varex Trade Secrets are not disclosed in the '317 or '692 patents, and they cannot be discovered simply by reverse engineering its X-ray tubes.

275.     On information and belief, Kluge, Lee, and Postman obtained the Varex Trade Secrets while they were employees of Varian, and were and are bound at all times to obligations of confidentiality and non-use for Varex Trade Secrets.

276.     Despite their duty to Varian (and by extension, Varex) to maintain the confidentiality of the Varex Trade Secrets, Kluge, Lee, and Postman knowingly and willfully disclosed the Varex Trade Secrets to RELL. On information and belief, Kluge, Lee, and Postman have disavowed their confidentiality obligations to Varex.

277.     On information and belief, RELL acquired the Varex Trade Secrets by improper means by inducing Kluge, Lee, and Postman to breach their duty to maintain the confidentiality of the Varex Trade Secrets. Kluge, Lee, and Postman did not have Varian's or Varex's express or implied consent to disclose the Varex Trade Secrets to RELL.

278.     On information and belief, RELL knew that the Varex Trade Secrets were acquired by improper means (namely, by Kluge, Lee, and Postman breaching their duty to maintain the confidentiality of the Varex Trade Secrets) when it acquired the Varex Trade Secrets from Kluge, Lee, and Postman.

279.     RELL further misappropriated at least some of the Varex Trade Secrets by using the underlying information to develop the knock-off Accused Products for RELL and thereby commercially exploit the Varex Trade Secrets in competition with Varex.

280.     Not only has RELL used Varex Trade Secrets previously disclosed by Kluge, Lee, and Postman, it is inevitable that Kluge, Lee, and Postman will continue to disclose Varex Trade Secrets to RELL in violation of the UTSA, and thereby facilitate RELL's improper efforts to directly compete with Varex.

281.   On information and belief, there are not sufficient safeguards in place at RELL to prevent the disclosure of Varex Trade Secrets within RELL.

282.   On information and belief, RELL has encouraged and will continue to encourage Kluge, Postman, and Lee to disclose Varex Trade Secrets.

283.    Without intervention by the Court, additional Varex Trade Secrets will inevitably be disclosed by Kluge, Lee, and Postman to RELL.

284.   RELL's actions identified herein, as well as other acts yet to be discovered, constitute misappropriation of trade secrets under the UTSA. Because of Defendants' misappropriation of the Varex Trade Secrets, Varex is entitled to recover damages for its actual losses and for RELL's unjust enrichment pursuant to Utah Code § 13-24-4(1). Alternatively, in lieu of damages for actual losses and for unjust enrichment, Varex is entitled to a reasonable royalty from RELL as a measure of its damages caused by RELL's misappropriation of the Varex Trade Secrets pursuant to Utah Code § 13-24-4(1).

285.   As a direct result of Defendants' misappropriation, Varex has sustained and will continue to sustain severe and irreparable harm, damage, and injury to the value of the Varex Trade Secrets and competitive advantage, which have required significant time and resources to develop and secure.

286.   RELL knowingly, willfully, and maliciously misappropriated the Varex Trade Secrets in conscious disregard of Varex's rights in a deliberate effort to injure Varex's business and improve its own business. Varex is entitled to recover attorney's fees pursuant to Utah Code § 13-24-5 and exemplary damages pursuant to Utah Code § 13-24-4(2).

287.   The competitive advantage, value, and goodwill that Varex has earned through the development and use of the Varex Trade Secrets will be lost forever if

61

Defendants continue to misappropriate them, and such harm will continue unabated absent an injunction requiring Defendants to return and cease and desist from any use of any Varex Trade Secrets. Varex is thus entitled to injunctive relief against Defendants pursuant to Utah Code § 13-24-3.

## COUNT V

### Misappropriation of Trade Secrets under the Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.* (In the Alternative to Count IV)

288.    Varex repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

289.    The Varex Trade Secrets are Varex's protectible trade secrets under the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065 *et seq.* Considerable time and resources were expended developing, refining, and/or compiling the Varex Trade Secrets.

290.    Varian took reasonable measures to protect and maintain the secrecy and confidentiality of the Varex Trade Secrets, including without limitation: (i) password protection to access Varian's systems containing the Varex Trade Secrets; (ii) document control procedures; (iii) restricting access to document management systems to company personnel on a need-to-know basis; (iv) providing trainings on confidential information; (v) creating and implementing policies adducing the nature, character, and protection of confidential information; (vi) requiring employees, including Kluge, Lee, and Postman, to be bound to strict confidentiality obligations, including those as forth in employment agreements (*see* Lee PIIA, Postman 1995 PIIA, Postman 2013 PIIA); (vii) requiring departing employees, including Kluge, Lee, and Postman, to reaffirm strict post-termination confidentiality obligations, including those as set forth in termination-related agreements

(*see* Lee Separation Agreement, Lee Termination Statement, Postman Retirement Agreement, Postman Termination Statement; and (viii) requiring employees, including Kluge, Lee, and Postman, to return upon termination all materials relating to Varian's business, including trade secrets and other proprietary and confidential materials.

291.    Varex adopted these same reasonable measures after the Spin-Off from Varian and continues to take these same reasonable measures today. Neither Varian nor Varex has granted permission to reproduce, use, or disclose, in whole or in part, the Varex Trade Secrets.

292.    The Varex Trade Secrets are not generally known to anyone outside of Varex, except persons or entities bound to stringent confidentiality obligations, and their secrecy confers substantial economic advantage and benefit to Varex. Knowledge of the Varex Trade Secrets would also confer a substantial economic benefit to Varex's competitors and those seeking to compete with Varex, including RELL.

293.    Without the Varex Trade Secrets, it would take a competitor a considerable amount of time, effort, expense, and expertise to duplicate the Varex Trade Secrets, and it is unlikely that the Varex Trade Secrets could be duplicated at all without access to them. The Varex Trade Secrets are not disclosed in the '317 or '692 patents, and they cannot be discovered simply by reverse engineering its X-ray tubes.

294.    On information and belief, Kluge, Lee, and Postman obtained the Varex Trade Secrets while they were employees of Varian, and were and are bound at all times to obligations of confidentiality and non-use for Varex Trade Secrets.

295.    Despite their duty to Varian (and by extension, Varex) to maintain the confidentiality of the Varex Trade Secrets, Kluge, Lee, and Postman knowingly and willfully

disclosed the Varex Trade Secrets to RELL. On information and belief, Kluge, Lee, and Postman have disavowed their confidentiality obligations to Varex.

296.    On information and belief, RELL acquired the Varex Trade Secrets by improper means by inducing Kluge, Lee, and Postman to breach their duty to maintain the confidentiality of the Varex Trade Secrets. Kluge, Lee, and Postman did not have Varian's or Varex's express or implied consent to disclose the Varex Trade Secrets to RELL.

297.    On information and belief, RELL knew that the Varex Trade Secrets were acquired by improper means (namely, by Kluge, Lee, and Postman breaching their duty to maintain the confidentiality of the Varex Trade Secrets) when it acquired the Varex Trade Secrets from Kluge, Lee, and Postman.

298.    RELL further misappropriated at least some of the Varex Trade Secrets by using the underlying information to develop the knock-off Accused Products for RELL and thereby commercially exploit the Varex Trade Secrets in competition with Varex.

299.    Not only has RELL used Varex Trade Secrets previously disclosed by Kluge, Lee, and Postman, it is inevitable that Kluge, Lee, and Postman will continue to disclose Varex Trade Secrets to RELL in violation of the ITSA, and thereby facilitate RELL's improper efforts to directly compete with Varex.

300.    On information and belief, there are not sufficient safeguards in place at RELL to prevent the disclosure of Varex Trade Secrets within RELL.

301.    On information and belief, RELL has encouraged and will continue to encourage Kluge, Postman, and Lee to disclose Varex Trade Secrets.

302.    Without intervention by the Court, additional Varex Trade Secrets will inevitably be disclosed by Kluge, Lee, and Postman to RELL.

303. Defendants' actions identified herein, as well as other acts yet to be discovered, constitute misappropriation of trade secrets under the ITSA. Because of Defendants' misappropriation of the Varex Trade Secrets, Varex is entitled to recover damages for its actual losses and for RELL's unjust enrichment pursuant to 765 ILCS 1065/4(a). Alternatively, in lieu of damages for actual losses and for unjust enrichment, Varex is entitled to a reasonable royalty from RELL as a measure of its damages caused by RELL's misappropriation of the Varex Trade Secrets pursuant to 765 ILCS 1065/4(a).

304. As a direct result of Defendants' misappropriation, Varex has sustained and will continue to sustain severe and irreparable harm, damage, and injury to the value of the Varex Trade Secrets and competitive advantage, which have required significant time and resources to develop and secure.

305. RELL knowingly, willfully, and maliciously misappropriated the Varex Trade Secrets in conscious disregard of Varex's rights in a deliberate effort to injure Varex's business and improve its own business. Varex is entitled to recover attorney's fees pursuant to 765 ILCS 1065/5 and exemplary damages pursuant to 765 ILCS 1065/4(b).

306. The competitive advantage, value, and goodwill that Varex has earned through the development and use of the Varex Trade Secrets will be lost forever if Defendants continue to misappropriate them, and such harm will continue unabated absent an injunction requiring Defendants to return and cease and desist from any use of any Varex Trade Secrets. Varex is thus entitled to injunctive relief against Defendants pursuant to 765 ILCS 1065/3.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Varex prays for judgment and relief as follows:

A.      Enter judgment on all counts in favor of Varex;

B.      A determination that RELL has infringed and is infringing the '692 and '317 patents;

C.      A preliminary and permanent injunction against RELL and its officers, employees, agents, servants, attorneys, instrumentalities, and/or those in privity with them, from (i) infringing the '692 and '317 patents, and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283, (ii) return all documents, files, programs, data, metadata, and other information of any kind preserved, without alteration, deletion, or spoliation, together with any and all copies of any of the foregoing in any medium or format, and (iii) return all of Varex's confidential and propriety information and trade secrets in their possession, custody, or control;

D.      An award to Varex of such damages, not less than a reasonable royalty, as it shall prove at trial against RELL that is adequate to fully compensate Varex for RELL's infringement of the '692 patent and '317 patent.

E.      An award to Varex of such damages to fully compensate Varex for RELL's infringement of the '692 patent and '317 patent and RELL's misappropriation of Varex Trade Secrets, including compensation for RELL's unlawful accelerated entry into the market and establishing itself as a competitor to Varex based on the unlawful use of Varex's patent rights and trade secrets;

F.      A determination that RELL's infringement has been willful, wanton, and deliberate and that the damages arising from such infringement be increased up to treble on this basis or for any other basis in accordance with the law;

66

G.     A finding that this case is "exceptional" and, on that basis, an award to Varex of its costs and reasonable attorneys' fees, as provided by 35 U.S.C. § 285;

H.     An accounting of all infringing sales and revenues, together with post-judgment interest and pre-judgment interest from the first date of infringement of the '692 patent and the '317 patent;

I.     A determination that RELL's misappropriation of Varex Trade Secrets was willful and malicious, and that the damages arising from such misappropriation be increased up to double on this basis or for any other basis in accordance with the law, and further that Varex be awarded its reasonable attorney's fees; and

J.     Such further relief as the Court deems proper and just.

Respectfully submitted,

Dated: October 5, 2020

By: /s/ David H. Bluestone
    Michael S. Elvin (IL Bar No. 6199051)
    michael.elvin@bfkn.com
    David H. Bluestone (IL Bar No. 6269436)
    david.bluestone@bfkn.com
    Caroline H. Sear (IL Bar No. 6317527)
    carrie.sear@bfkn.com
    BARACK FERRAZZANO KIRSCHBAUM &
    NAGELBERG LLP
    200 West Madison Street, Suite 3900
    Chicago, IL 60606
    T: (312) 984-3100
    F: (312) 984-3150

**ATTORNEYS FOR VAREX
IMAGING CORPORATION**